WILLIAM EBLING, Appellant, v. HENRY DREYER, Respondent.

1. SALE OF INFANTS' LANDS — SPECIAL ACT OF THE LEGISLATURE. The legislature has power by special act to authorize a sale of infants' lands, including the future contingent interests of those not in being.

2. VALIDITY OF SPECIAL ACT AUTHORIZING SALE OF LANDS DEVISED TO INFANT REMAINDERMEN — LAWS OF 1872, CHAP. 479 — SALE OF SEPARATE DEVISES AS ONE PARCEL. The special act (Laws of 1872, chap. 479) which authorized the sale, by a proceeding in the Supreme Court, of a tract of land which had been divided by a testator in his will by imaginary lines into as many parts as he had children, and devised by separate devises, a part to each child for life, with remainders over to the children of each life tenant, the remaindermen in existence at the passage of the act being infants and the life tenants being still alive, and the sale being necessary to prevent a total loss of the property by reason of unpaid taxes and assessments, was within the power of the legislature, and was not invalidated by the fact that it permitted the sale of the separate properties of different infants as a single parcel, it appearing that, since the death of the testator, the situation of the parties and the condition of the property had so changed that a separate sale of the respective parcels would have been an injury to the infant remaindermen.

3. VALIDITY OF PROVISION FOR DISTRIBUTION OF FUND ARISING FROM SALE OF LAND, SUBJECT TO ORDER OF COURT. The above act is not open to the objection that it provided for an unlawful distribution of the proceeds of the sale, it appearing that there was nothing in the act to prevent a lawful distribution, and the presumption being that, under the provision that the proceeds of the sale remaining after deducting the expenses of the sale and of freeing the land from liens were to be invested to abide the order of the court, the court would do its duty and so finally distribute the fund substituted for the land as to carry out the wishes of the testator.

4. PAYMENT OF PROCEEDS OF SALE INTO COURT. When a statute authorizes a sale of property and the payment of the net proceeds into court to abide its order, it necessarily means that they are to be paid out only to those entitled and as they are entitled.

5. VENDOR AND PURCHASER — VALIDITY OF TITLE DEPENDENT ON CONSTRUCTION OF STATUTE. When the alleged defects in the title tendered by a vendor of real estate depend wholly on the construction of a statute and a decree made thereunder, and the Court of Appeals determines that the title is valid, the possibility that it may, at some time in the future when other parties are before it, disregard its own precedent and decide the same question, depending on the same facts, in a different way, is too remote to relieve the purchaser from being compelled to accept the title.

*Ebling* v. *Dreyer*, 79 Hun, 319, reversed.

(Argued April 22, 1896; decided May 26, 1896.)

APPEAL from judgment of the General Term of the Supreme Court in the first judicial department, entered upon an order made April 2, 1894, directing judgment in favor of the defendant for damages and costs, upon the submission of a controversy without action, under section 1279 of the Code of Civil Procedure.

On the 11th of August, 1863, Joseph Cudlipp died seized of a tract of land in the town of Morrisania, consisting of about ten acres, which, by his will dated June 20th, 1862, and admitted to probate September 22nd, 1863, he devised, as follows, viz. :

"Item.  The piece of ground owned by me in Westchester county, on Union avenue and Westchester road, I order and direct to be divided into four equal parts or shares lengthwise; the part or share fronting on the Westchester road I give, devise and bequeath to my son Joseph; the part next adjoining to my daughter Annie; the part next adjoining to my daughter Sarah, and the part next adjoining to my daughter Elizabeth, the land so devised to be held by them respectively during their natural lives, and upon their deaths respectively to their respective children forever, subject, however, to the dower interest of my said wife."

He left him surviving a widow, who died February 13th, 1869, and said four devisees, his only heirs at law.  When he died his daughter Elizabeth was married and had five children, but none of the other devisees had children at that time, although each has had children born since.  In 1871, pursuant to chapter 841 of the Laws of 1868, the commissioners of taxes and assessments laid out streets through the plot of land, both lengthwise and crosswise, and filed maps thereof accordingly. The streets " did not conform to the line of division as fixed by the testator, and as a result the third part, for instance, which was devised to the use of his daughter Sarah, had no frontage whatever upon any street running lengthwise through the property, while the second part, the use of which was given to the daughter Annie during her life, had a frontage upon the street on both sides, but the lots had little depth,"

and thus the value of one of the devised portions was increased more than the others. The property was wholly unproductive, the assessed value was "many times greater than the value thereof at the time of the death of the testator," the taxes were heavy, and sale after sale for non-payment thereof had been made, the means of the devisees were small, while the children had no property whatever except their interest in the remainder. On May 3rd, 1872, while the title and premises were in this condition, an act was passed by the legislature (L. 1872, ch. 479) authorizing the Supreme Court, upon the application of the four devisees and their lawful issue in being, in person if of age, and by a next friend if infants, to sell and convey said lands, or any part thereof, in fee simple absolute and in such a manner as would best promote the interests of those concerned, whether in being or not, and whether their interests were present or contingent. The method of procedure was carefully regulated by the act, which provided that the conveyances thus given should be valid and effective to vest in the purchaser a fee simple absolute as against all persons having any title, interest or estate in the lands, and all, whether in being or not, who might become interested therein under said will. The proceeds of the sale made by the referee, after payment "under the direction of the court," of costs, expenses, taxes, assessments and incumbrances, were to be paid to the county treasurer or some trust company to be designated by the court, and invested in mortgages on real estate in this state "for the benefit of such persons as are or may become interested in said lands" under said will; "and the same, as well as the interest and income thereof" were to "abide the order of said court." Authority was given to the life tenants to consent to receive a gross sum in lieu of their several life interests in accordance with the provisions of the Revised Statutes relating to that subject and also for their reimbursement "out of the proceeds of such sale for their several proportions of any assessments for permanent improvements imposed upon said premises or any part thereof which may have been heretofore paid by them."

On the eighth of August, 1872, a petition setting forth these facts, among others, and verified by the four devisees, by such of their children as were fourteen years old, and by the next friend of such as were under that age, was presented to the Supreme Court, praying for the sale of the premises under said act. The petition further stated that on the death of the devisees, " or either of them, the said premises will be so incumbered by taxes and assessments and sales for the same that the interests of the remaindermen will be of little or no value." A guardian *ad litem* was appointed for the minors in the usual way as well as a referee to inquire as to the truth of the allegations contained in the petition and as to whether a sale was necessary or expedient to promote the interests of all concerned in the lands according to said will. The referee reported the facts substantially as set forth in the petition, and stated, among other things, that no income could be derived from the land; that streets were being constantly cut through it and assessments made therefor; that the value of the land, in gross, was $30,000, it having greatly increased since the death of the testator; that from the ages of the life tenants it was reasonable to believe that at their death the lands would be so incumbered by taxes and assessments and sales therefor that the remainder would be of little value; that the same would be totally lost to the remaindermen if permitted to remain as it then was; that the premises were worth as much then as they would be for many years to come, and would readily find purchasers at fair prices; that the proceeds would yield a fair income to the life tenants; that the lands could be sold to better advantage at public than at private sale, and that a sale was necessary and calculated to promote the interests of those entitled upon the death of the life tenants, whether in being or not. The court confirmed the report, adjudged that a sale was necessary, and directed that the premises be sold at public auction, according to a map to be made and filed by the referee, showing a division of the tract into city lots, and decreed that " any and all conveyances to be made in pursuance of the authority and direction of this

court shall be valid and effectual to vest in the purchaser or purchasers his, her or their heirs and assigns, the fee simple absolute as against all persons having any claim to or right, title and interest or estate in such lands, premises or real estate under the said last will and testament, and all persons, whether in being or not, who might become interested therein under said will." The referee was directed out of the proceeds to pay the costs, expenses, and " all taxes and assessments," and to deposit the residue with the Brooklyn Trust Company, to be invested in its name, in the manner provided by the statute, " for the benefit of such persons as are or may become interested in said lands." He was also authorized to pay the life tenants, if they should so elect, a sum in gross in lieu of their several life interests, in accordance with the Revised Statutes, setting forth chapter, section, &c., as well as their several proportions of moneys paid as assessments for permanent improvements. Any party in interest was given leave to apply to the court at any time for any further directions and instructions.

June 30th, 1873, a sale was had, and the proceedings of the referee were duly confirmed. They are conceded to have been regular and in conformity to the act and order, except that " it does not appear from the said report, or any other matter of record, that the said referee observed in such sale, or in his disposition of the proceeds thereof, the division into four plots made by the will of Joseph Cudlipp, except the indication of such division by red lines upon " a map filed by him.

Some of the life tenants are yet living, and the proceeds of the sale are in part still in the possession of the trust company, subject to the order of the court.

June 1st, 1892, by written agreement, the plaintiff agreed to sell and convey in fee simple, free from incumbrances, and the defendant agreed to purchase, a portion of said premises at the price of $3,400. The plaintiff's only source of title was through the deed of said referee to his grantor, but his title is conceded to be good, provided that deed was in all respects effectual. Performance was to be made July 6th,

1892, when the plaintiff tendered a deed sufficient in form, but which the defendant refused to accept on the ground that said proceedings did not divest the interest of the grandchildren of the testator, whether born before or after the commencement of said proceedings, of whom there were several of each kind then alive. Upon these facts the parties submitted their rights to the General Term, the plaintiff demanding judgment for the sum of $3,060, the balance unpaid of the purchase price, while the defendant claimed judgment for the sum of $340 paid down upon the contract, and $68 necessary expenses, with interest and costs. The court awarded judgment in favor of the defendant, in accordance with his demand.

*Rudolf Dulon* for appellant. The objections to the title are invalid. (*Brevoort* v. *Grace*, 53 N. Y. 245; *Cochran* v. *Van Surlay*, 20 Wend. 365; *In re Field*, 131 N. Y. 184; *Kent* v. *Church of St. Michael*, 136 N. Y. 10.) The sale of land was necessary for the protection of the interests of all persons presently or contingently entitled thereto, in being or not in being. (*Brevoort* v. *Grace*, 53 N. Y. 248.)

*Edward E. Sprague* and *Wm. H. Stockwell* for respondent. The act of the legislature can only be sustained under its powers as *parens patriæ.* (*Brevoort* v. *Grace*, 53 N. Y. 245; *Powers* v. *Bergen*, 2 Seld. 358; *Cochran* v. *Van Surlay*, 20 Wend. 365; *Clarke* v. *Van Surlay*, 15 Wend. 440; *Leggett* v. *Hunter*, 19 N. Y. 445.) The exercise of this legislative power is subject to judicial review. (*Brevoort* v. *Grace*, 53 N. Y. 251; *In re N. F. & W. R. Co.*, 108 N. Y. 375; *In re Jacobs*, 98 N. Y. 98; *People* v. *Gillson*, 109 N. Y. 389; *In re Field*, 131 N. Y. 184.) It was not competent for the legislature to authorize the payment of a gross sum to the life tenants. (*Deraismes* v. *Deraismes*, 72 N. Y. 154; *Cairns* v. *Chabert*, 3 Edw. Ch. 312; *Sidenberg* v. *Ely*, 90 N. Y. 257; *Thomas* v. *Evans*, 105 N. Y. 601; *People ex rel.* v. *Ryder*, 124 N. Y. 500; *Dunham* v. *Townshend*, 118 N. Y. 281, 286.)

It was not competent for the legislature to provide for payment of taxes out of the entire fund. ( *Westervelt* v. *Gregg*, 12 N. Y. 202; *People* v. *O'Brien*, 111 N. Y. 1 ; *Berley* v. *Rampacher*, 5 Duer, 183 ; *McCahill* v. *Hamilton*, 20 Hun, 388.) The title is, at best, too doubtful to be forced upon a purchaser. (*Abbott* v. *James*, 111 N. Y. 673 ; *Fleming* v. *Burnham*, 100 N. Y. 8; *Jordan* v. *Poillon*, 77 N. Y. 518; *Kilpatrick* v. *Barron*, 125 N. Y. 751.)

VANN, J. This appeal presents a question of power on the part of the legislature to pass the statute in question (L. 1872, ch. 479), and of regularity on the part of the Supreme Court in its proceedings under the statute.

The power of the legislature by special act to authorize a sale of infants' lands, including the future contingent interests of those not in being, is well established in this state. In the case of *Clarke* v. *Van Surlay* (15 Wend. 436) it was held by the Supreme Court that where the rents and profits of land are given to a father during his life, with remainder in fee to his lawful issue, and it is necessary for the support and maintenance of the father and his family, and the education of his children, that the land should be sold, a private act of the legislature, authorizing a sale for such purposes, as well as for the payment of debts necessarily incurred by the father for those purposes, is not unconstitutional, although its operation is limited to a particular property and does not extend to all cases of like character. Judge BRONSON, in delivering the opinion of the court, quoted a passage from Blackstone's Commentaries in regard to the power of Parliament by a particular law to unfetter an estate, by assuring it to a purchaser against the remote or latent claims of infants, and settling a proper equivalent in proportion to the interest so barred. (2 Black. Com. 344, 5.) The learned judge, however, said that acts of this description do not depend for validity on the omnipotent power of Parliament, for, while the legislature ought not to interfere upon light considerations, there was no constitutional impediment in the way of enacting private laws

affecting individual interests, where proper care is taken to preserve the substantial rights of the parties. When the case reached the Court of Errors under the name of *Cochran* v. *Van Surlay* (20 Wend. 365), it was affirmed, and the act held to conflict with neither the State nor Federal Constitution. The power of the legislature was upheld upon the ground that as *parens patriæ*, it had the right to interfere in particular cases for the benefit of incompetent persons, and that a change from unproductive real estate into productive personal property, the income of the latter to be applied in the same way as the income from the former, was a proper case for the exercise of the power.

In *Brevoort* v. *Grace* (53 N. Y. 245) this court sustained the right by special act to "authorize the sale of the lands of those not capable of acting for themselves, and also the contingent rights of those not *in esse*" at the time, but held that the power did not extend to the sale of lands in which adults, competent to act for themselves, have an interest, without their consent. There are other cases bearing upon the subject, from which the following are cited : *Leggett* v. *Hunter* (19 N. Y. 445); *In re Field* (131 N. Y. 184); *Kent* v. *Church of St. Michael* (136 N. Y. 10).

While the power is not unlimited, but is subject to judicial review, where the parties in interest are incapable of acting for themselves, and the legislation is for their benefit, not only in theory but in fact, it should be sustained both upon principle and authority. That a sale of the lands in question was necessary to protect all persons interested, in being or not, is hardly open to discussion, for the income was nothing, the outgo large, the life tenants had limited and the remaindermen no means, while the taxes and assessments and sales for the same were rapidly sweeping the property out of existence. The legislature came to the rescue, and but for its timely action nothing could have been saved for any one.

It is insisted, however, that even if the legislature had power to pass an act upon the subject, it had no power to pass the act in question, because, it is argued, it permits the court

to deal with the separate properties of different infants as a single parcel, and provides for an unlawful distribution of the proceeds. In considering these objections regard must be paid to the fact that the situation of the parties had become so changed between the date of the testator's death and the time when the act was passed, as to make any course other than the one pursued impracticable as well as unjust. The property when devised by the testator consisted of a single tract of land, without streets or any visible lines of division. He divided it into four equal parts by imaginary lines running the longer way. Subsequently, under lawful authority, streets were laid out through it, in such a manner as to leave three of the parcels without any frontage, except upon cross streets, while the parcel remaining was cut into two long, narrow strips by a street running lengthwise, so that although there was a frontage on both sides there was so little depth as to make the lots of slight value. It is obvious that, under these circumstances, parcels could not be separately sold except at a disadvantage, while if sold together the highest price possible could be realized. The property came through one will, although by separate devises, and all of the devisees were nearly related. Situated as the property was, it would have been impossible to observe the lines of individual ownership in making a sale without a serious sacrifice of value. A separate sale of the four parcels would have been an injury to the remaindermen. As the legislature had the power to authorize a sale for the benefit of the infants, it necessarily had the right to so order the sale as, in its reasonable judgment, to confer the greatest benefit upon them. It was practicable after the sale, first deducting the expense thereof, to separate the remainder of the proceeds of the several parcels in proportion to their respective values and thus to preserve every right that each of the several interests was entitled to. It simply involved the determination of what each separate parcel, situated as it was before the sale, was worth when compared with the value of the entire tract, and the four fractions resulting would represent the proportion of each of

the four interests in the proceeds of the sale. After thus separating the money into four separate parts, each representing the value of the four different interests in the land, and deducting from each the charges against it for taxes, liens, incumbrances, and the value of the life estate pertaining to it, the result would be equal and exact justice between all. As it was the duty of the life tenants to pay the annual taxes, that fact would have to be taken into account in fixing the value of their life estates if they elected to take a gross sum, or if they did not, the amount of those taxes unpaid would have to be deducted from the annual income going to them respectively.

The statute, as we read it, does not authorize an unlawful distribution of the proceeds of the sale. The theory of the act is to convert the land into money, so as to save it from total loss, and after payment of the money into court and deducting the expenses of the sale, including the expenditures necessary to give a good title to the purchaser, to treat the remainder as land, and divide it according to the directions of the will. While this is not all required in so many words, it logically and necessarily follows from what is required. The main provisions of the statute are addressed to the method of turning the land into money, and, as a necessary incident to this end, it authorizes the use of so much of the proceeds as would free the land from liens. This was to be done "under the direction of the court," and, although temporarily the deduction might be made in bulk for convenience, it cannot be assumed that the court in its final disposition of the matter would permit any interest in the property to bear a burden that legally rested upon another. Even if the first order was silent upon the subject, as the court retained control of the proceeding, it is to be presumed that by its final direction all equities between the different parties will be adjusted upon the proper basis. Whatever a statute requires to be done under the direction of the court, it requires to be done according to law. In this case there was nothing in the statute to prevent a lawful division, for if the court did its duty each interest would bear its proper burden and receive its proper benefit.

It was not essential to the validity of the act that the precise method of distribution, with every detail of administration, should be set forth, for all that could properly be left to the wisdom of the court under the implied direction to administer the fund according to law. That established the principle upon which distribution was to be made, and all the details could be worked out by the court. Thus, it is provided that after title is assured to the purchaser by discharge of liens and conveyance of the land, the remainder of the money should be paid to a designated depository to be invested in bonds and mortgages, and that "the same, as well as the interest and income thereof, shall abide the order of said court." It also permits, but whether this was done or not does not appear, the life tenants to "consent to receive a sum in gross in lieu of their several life interests," when ascertained according to the Revised Statutes. Thus the procedure, when there is a statute to guide, must be in accordance with that statute, but when there is no statute, as the express command is that the fund shall abide the order of the court, it follows by necessary implication that it is to be according to the common law and the established practice in such matters. When a statute authorizes a sale of property and the payment of the net proceeds into court to abide its order, it necessarily means that they are to be paid out only to those entitled and as they are entitled. No other construction is possible, except upon the assumption that the Supreme Court would fail to do its duty. The possession of the fund, under authority of the statute, carries with it the power to take such evidence, try such issues and determine such questions as are necessary in order to dispose of the money, thus substituted for the land, so as to carry out the wishes of the testator. It may be that the court has in fact made a mistake by distributing a part of the fund contrary to law, but that is not material to the purchaser, provided it could have made a correct apportionment. Moreover, if any error has been committed in the proceedings since the sale, it can still be corrected, for a part of the money is yet in court and subject to its order.

We think that the legislature had power to pass the act, that the sale under the act was valid and vested a good title in the purchaser, and that the title tendered by plaintiff to defendant was free from reasonable doubt.

It is further insisted, however, that, even if the title is good in fact, specific performance should not be compelled, because the questions raised remain open, inasmuch as the grandchildren of the testator, born since the sale under the statute, are not parties to the action and are not bound by our determination. There would be much force in this position if the alleged defects in the title depended upon questions of fact or upon doubtful questions of law, but as they rest wholly on the construction of a statute and a decree made thereunder, we do not think we should hesitate, under all the circumstances, in declaring the title free from judicial doubt, and requiring the defendant to perform his contract. When the court has carefully examined and deliberately decided a question, its decision becomes a part of the common law, and is binding upon it as well as upon all the other courts of the state. The possibility that it may, at some time in the future, when other parties are before it, disregard its own precedent and decide the same question, depending on the same facts, in a different way, is so remote that it should not be permitted to arrest the development and destroy the salability of a large tract of land, possibly for a generation.

The judgment of the General Term should be reversed and judgment rendered in favor of the plaintiff in accordance with his demand, with costs, the form thereof to be settled before the judge who prepared the opinion of the court.

All concur, except GRAY, J., dissenting.

Judgment accordingly.